IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| DARRELL ALLEN BERLIN, Individually and as Independent Administrator of the Estate of CALEB RAY EMORY, Deceased, <br><br> Plaintiff, <br><br> v. <br><br> MONIQUE L. MANDERSON, STEPHANIE BULLAR, RAYMELLE SCHOOS KELLY KOENEMAN <br><br> Defendants | No: _____ |

## COMPLAINT

NOW COMES the Plaintiff, DARRELLL ALLEN BERLIN, individually and as Independent Administrator of the Estate of CALEB RAY EMORY, deceased, by and through his attorneys, ROMANUCCI & BLANDIN, LLC, as his Complaint against MONIQUE L. MANDERSON, STEPHANIE BULLAR, RAYMELLE SCHOOS, KELLY KOENEMAN pleading as follows:

### I. JURY DEMAND

1. Plaintiff DARRELL ALLEN BERLIN, individually and as Independent Administrator of the Estate of CALEB RAY EMORY, deceased, hereby demands a trial by jury.

### II. INTRODUCTION

2. On June 7, 2021, Caleb Emory died by suicide at Chester Mental Health Center, an inpatient, psychiatric hospital controlled and operated by the Illinois Department of Human Services.

1

3.  Caleb was diagnosed with schizoaffective disorder, a serious mental illness, had a history of attempting suicide and self-harm, and presented with several other factors indicating an elevated risk of suicide.
4.  Prior to being transferred to Chester, Caleb was housed at Dixon Correctional Center, but mental health professionals at Dixon determined that they could not provide an adequate level of care for his serious medical needs, and that Caleb needed to be housed in an inpatient facility like Chester Mental Health Center.
5.  Staff at Dixon specifically expressed their concern that Caleb was engaging in conduct that may place him in serious physical serious harm if not treated on an inpatient basis, and that hospitalization was necessary to prevent such harm.
6.  Defendants knew that Caleb was an increased risk of suicide and a danger to himself; they even included in his treatment goals that he would not engage in suicidal or self-injurious behavior.
7.  Despite their knowledge of his serious medical need, Defendants failed to take reasonable measures to ensure that Caleb was adequately monitored, received adequate mental health treatment, or was otherwise properly designated and treated as a serious suicide risk.
8.  Due to the Defendants' deliberate indifference, staff at Chester Mental Health Center found Caleb dead in his cell at or around 8:14 a.m., approximately three hours after Caleb had hung himself in the doorway of his cell with a bedsheet.

### III. JURISDICTION AND VENUE

9.  The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a), as Plaintiff's causes of action are brought under the Eighth and Fourteenth Amendments to the United States Constitution pursuant to 42 U.S.C. § 1983.
10. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), as one or more of the Defendants resides in this judicial district and a substantial part of the events or omissions giving rise to the claims asserted in this lawsuit occurred in this judicial district.

## IV.  PARTIES

11. At all times relevant hereto, Claimant DARRELL ALLEN BERLIN, individually and as Independent Administrator of the Estate of CALEB RAY EMORY, deceased, was a citizen of the United States and resident of the city of Tilton, county of Vermillion, State of Illinois.

12. On April 12, 2022, the Circuit Court of Vermillion County, Illinois, Probate Division, appointed DARRELL ALLEN BERLIN as Special Administrator for the Estate of CALEB RAY EMORY, deceased.

13. At all times relevant hereto, the Department of Human Services (DHS) was organized and existed by and under the laws of the state of Illinois.

14. At all times relevant hereto, Chester Mental Health Center (Chester) was controlled and operated by DHS.

15. At all times relevant, DHS, its agents, subsidiaries, assigns, and employees had custody and took responsibility to ensure the safety of CALEB RAY EMORY.

16. At all times relevant hereto, decedent CALEB RAY EMORY (also known as Caleb Berlin and hereinafter referred to as "Caleb") was a citizen of the United States and a resident of the county of Randolph, State of Illinois.

17. At all times relevant hereto, Monique L. Manderson was a psychiatrist at Chester Mental Health Center acting under color of law. She is sued in her individual capacity.

18. At all times relevant hereto, Stephanie Bullar was a licensed clinical social worker at Chester Mental Health Center acting under color of law. She is sued in her individual capacity.

19. At all times relevant hereto, Raymelle Schoos was a psychiatrist at Chester Mental Health Center acting under color of law. She is sued in her individual capacity.

20. At all times relevant hereto, Kelly Koeneman was a registered nurse at Chester Mental Health Center acting under color of law. She is sued in her individual capacity.

21. Upon information and belief, at all times relevant hereto, Defendants were employees of DHS.

## V.  FACTUAL ALLEGATIONS

1. On June 7, 2021, CALEB RAY EMORY died by suicide via asphyxiation while in involuntary custody at Chester Mental Health Center under the control, care, and supervision of the Department of Human Services (DHS).

3

2. Mr. Emory suffered from schizophrenia and the aftereffects of a traumatic brain injury.
3. As a teenager, Caleb was diagnosed with Attention Deficit/Hyperactivity Disorder (ADHD).
4. Caleb was incarcerated in multiple locations controlled by Illinois Department of Corrections (IDOC) throughout his adult life.
5. In October 2019, while incarcerated at Centralia Correctional Center, Caleb was placed on crisis watch for self-harm after it was reported that he punched himself in the eye.
6. Caleb was thereafter transferred from Centralia to Dixon Correctional Center's Special Treatment Unit (Dixon STU).
7. Caleb was released from IDOC on parole on February 19, 2020.
8. Caleb returned to Stateville NRC only months later on October 2, 2020 for violating his parole after he allegedly lost his host site, cut off his GPS monitor, and began to act strange in public.
9. From Stateville NRC, Caleb was transferred to Dixon STU.

**A. Caleb's treatment at Dixon**

10. At Dixon STU, Caleb was placed in a mental health setting and "required placement on crisis level of care for extended periods of time due to being unstable," according to a report authored by Licensed Clinical Psychologist (LCP) Sheila Stone (Dr. Stone).
11. Prior to his placement of crisis watch, Caleb experienced delusions, which caused behavior such as running around his housing unit talking about spirits, stating he would not lock back up "because of his wings," and "having a spirit awakening and that space is unfolding in front of him."
12. After being placed on crisis watch, Caleb continued to verbalize delusions by saying things like "we are on an intergalactic plantation," "I've been dead since 2016," and that he was a vampire who had his fangs removed.
13. While Caleb was on crisis watch, he was informed that his mother had called to tell him that she loved him, to which he responded that she was not his mother.
14. On April 28, 2021, Dr. Sheila Stone completed an Inpatient Certificate in which she stated that Caleb "required placement in a mental health setting within prison due to the presence of psychiatric symptoms and behaviors, which have impacted his ability to function within his environment."

15. Attached to that certificate was a written evaluation by Dr. Stone in which she explained her reasons for recommending inpatient treatment, which included the following:
    a. Caleb's most recent diagnosis was Schizophrenia;
    b. Caleb had also been previously diagnosed with "Unspecified Other Substance Related Disorder" and "Antisocial Personality Disorder;"
    c. Caleb had "required placement on crisis level of care for extended periods of time due to being unstable";
    d. Caleb was placed on crisis watch in October 2019 because he engaged in self-harm by punching himself in the eye;
    e. Caleb often presented with "odd or bizarre behavior, poor hygiene, disorganized thoughts, and delusions[.]"
    f. Caleb was "religiously preoccupied";
    g. Caleb had been on crisis watch for over thirty days;
    h. "Prior to [Caleb's] placement on crisis watch, it was reported by Security and Mental Health Staff that he was running around the dayroom in his housing unit, talking about spirits and stated that he would not lock back up because of his wings.";
    i. Caleb had talked about "having a spirit awakening and that space is unfolding in front of him"
    j. Caleb was unable to state the year;
    k. Caleb was prescribed Zyprexa, was refusing psychotropic medication, and had been placed on enforced medication status on April 6, 2021;
    l. Caleb was adamant that his name was Gabriel, not Emory;
    m. Caleb verbalized delusions;
    n. Caleb was disoriented, hostile, and agitated;
    o. Caleb had been in special education classes in school and got sent to "behavior school;"
    p. Caleb had a history of abuse and domestic violence;
    q. Caleb had previously been shot in the head;
    r. Caleb had a significant history of substance abuse;
    s. Caleb's family member stated that people are scared of Caleb when he doesn't take his medication and he had previously been aggressive with her and her daughter

16. On or about April 28, 2021, at Dixon Correctional Center, Dr. Stone noted her concern that Caleb was engaging in conduct that may place him in serious physical serious harm if not treated on an inpatient basis, and that hospitalization was necessary to prevent such harm.

17. On or about April 28, 2021, at Dixon Correctional Center, Dr. Stone noted her concern that "he is at risk for further deterioration of his mental health and at risk for hurting himself or others."

18. At the time of her inpatient recommendation on April 28, 2021, Caleb had been on crisis watch for over 30 days.

19. On May 1, 2021, Roman Marquez, MD, completed a second Intake Certificate, in which he indicated that Caleb was at risk of harming himself unless placed on an inpatient basis and needed immediate hospitalization for the prevention of such harm.

**B. Caleb's arrival at Chester Mental Health Center.**

20. On May 13, 2021, Caleb was transferred to an inpatient treatment facility, Chester Mental Health Center (Chester), which was under the custody and control of DHS.

21. While at Chester Mental Health Center, Caleb was at an elevated risk of suicide.

22. An elevated risk of suicide is a serious medical condition.[1]

23. The following factors, among others, are associated with an increased risk of suicide in incarcerated individuals:[2]

    a. history of attempted suicide;
    b. having a history of self-harm;
    c. being prescribed psychotropic medication;
    d. current psychiatric diagnosis;
    e. alcohol misuse;
    f. white race or ethnicity;
    g. male gender;
    h. being convicted of a violent criminal offense;
    i. occupation of a single cell;
    j. having no social visits.

---

[1] *Est. of Clark v. Walker*, 865 F.3d 544, 551 (7th Cir. 2017)
[2] Zhong, Shaoling et al. "Risk factors for suicide in prisons: a systematic review and meta-analysis." *The Lancet. Public health* vol. 6,3 (2021).

24. Defendants knew through Dixon records, firsthand observations, and the obvious signs that Caleb presented with the above factors and was at an elevated risk of suicide.
25. Defendants had knowledge of Caleb's serious mental illness, incarceration history, refusal to take medication, symptoms relating to his mental illness, mental instability, and behaviors on and off crisis watch through its agents' review of records and first hand evaluation.
26. Defendants at Chester obtained and reviewed Dr. Stone's evaluation and the Inpatient Certificates.
27. Defendants at Chester had knowledge of Dr. Stone's concern that "he is at risk for further deterioration of his mental health and at risk for hurting himself or others."
28. Defendants at Chester knew that Caleb had been on crisis watch for extended periods of time and was entering Chester having been on crisis for more than 30 days.
29. Defendants at Chester knew he had been on court-enforced medication since April 6, 2021.
30. Defendants at Chester knew he was an alcoholic and had a history of using marijuana, cocaine, methamphetamine, heroine, and sleeping pills.
31. At all times relevant hereto, Monique L. Manderson was a psychiatrist at Chester.
32. At all times relevant hereto, Stephanie Bullar was a licensed clinical social worker at Chester.
33. At all times relevant hereto, Raymelle Schoos was a psychiatrist at Chester.
34. At all times relevant hereto, Kelly Koeneman was a registered nurse at Chester.
35. At all times relevant hereto, Manderson, Bullar, Schoos, and Koeneman were agents, employees, and/or servants of the Department of Human Services (DHS).
36. On May 13, 2023, Monique Manderson conducted Caleb's Initial Psychiatric Evaluation, and indicated that she had obtained and reviewed the Inpatient Certificates and Dr. Stone's evaluation.
37. Manderson thus had knowledge of the information in those documents, including the recommendation that Caleb be placed in a "structured setting that will monitor him closely for his own safety."
38. Caleb's Initial Psychiatric Evaluation reviewed by Manderson also noted the following:
    a. Dixon staff had "essential reservations about Mr. Emory's ability to return to the community;"
    b. Caleb's "chief complaint" was "I go by Galeb;"

    c. Caleb's family had expressed significant concerns about his ability to return to society as well and was seeking guardianship over her son;

    d. People were "scared" of Caleb when he did not take his medication;

    e. Caleb had poor hygiene, poor self-care, and an overall disheveled appearance;

    f. Caleb had a history of fighting with staff and officers;

    g. Caleb had a history of hearing voices;

    h. Caleb reported polysubstance abuse of marijuana, cocaine, crack, methamphetamine, and alcohol;

    i. Caleb's mother was diagnosed with Bipolar Disorder;

    j. Caleb's attitude was guarded, paranoid, and suspicious;

    k. Caleb's thought content contained "delusions of grandeur, in addition to hyperreligiousity;"

    l. Caleb was noncompliant with his psychotropic medication.

39. Manderson noted in this Evaluation that, at Dixon, Caleb "was deemed dangerous to self and others."

40. On May 13, 2023, Monique Manderson conducted Caleb's 3-day Treatment Plan Worksheet, in which she indicated the following:

    a. Caleb's primary diagnosis was schizoaffective disorder.

    b. Caleb's secondary diagnosis was polysubstance abuse of cocaine, meth, and marijuana.

    c. Caleb had disorganized thoughts, history of verbal and physical aggression, paranoia, and impaired insight and judgment.

    d. Caleb was prescribed Olanzapine for his psychosis and mood.

    e. Caleb was prescribed Lorazepam for his anxiety and agitation.

41. Despite noting several factors associated with increased risk of suicide and noting that there were no protective factors for suicide, Manderson disregarded the information and indicated there were not serious suicidal concerns.

42. Manderson disregarded the information available to her and recommended Caleb be subject to the lowest level of observation frequency.

43. On May 13, 2021, Manderson completed Caleb's Admission Suicide Risk Assessment, noting the following:

    a. Caleb's primary diagnosis was schizoaffective disorder.

    b. Caleb's secondary diagnosis was polysubstance abuse of cocaine, meth, alcohol, and marijuana.

    c. Caleb tried to hang himself five years ago.

    d. Caleb did not make any future plans during his assessment.

44. Despite noting several factors associated with increased risk of suicide, noting that there were no protective factors for suicide, and knowing that Dixon mental health professionals deemed Caleb dangerous to himself, Manderson disregarded all of this knowledge and indicated that there were not serious suicidal concerns.

45. Despite all her knowledge of mental health and suicide risk, Manderson recommended Caleb be subject to the lowest level of observation frequency.

46. On May 13, 2021, Koeneman completed an Initial Suicide Assessment Form, noting that Caleb had wished he was dead, wished he could go to sleep and not wake up, and had actual thoughts of killing himself.

47. This Initial Suicide Assessment Form characterized Caleb as having a high risk of suicide.

48. On May 13, 2021, Koeneman completed Caleb's Initial Psychiatric Nursing Assessment, noting the following:

    a. Caleb responded "I burnt my grandma's house down" when asked what problems brought him to the hospital;

    b. Caleb was having religious delusions;

    c. Caleb had attempted suicide at least twice in the past, with the most recent attempt being 2015;

    d. Caleb had a history of engaging in "fire setting behavior;"

    e. Caleb had previously had surgery on his face, nose, lip, and earlobe;

    f. Caleb's recent memory was impaired;

    g. Caleb had an irregular pulse;

    h. The facility had "Knowledge of Medication" and a "Plan to Manage Psychiatric Illness" that was further detailed in his treatment plan.

49. On May 13, 2021, Koeneman and Manderson created Caleb's Admission Treatment Plan, which noted that Caleb had psychiatric problems including psychosis, mood disorder, aggression, and a history of inappropriate sexual behaviors.

50. Their Admission Treatment Plan failed to identify suicide and self-injury as one of Caleb's psychiatric problems yet included "Patient will have no suicidal ideation or self-injurious behaviors for 30 days" as one of his long-term treatment goals.
51. Their Admission Treatment Plan noted his "Emotional Dysregulation" as "anxious" and "labile."
52. Their Admission Treatment Plan noted Caleb suffered from delusions.
53. Between May 14 and May 21, 2021, the medical team at Chester, including treating psychiatrist Dr. Raymelle Schoos and Therapist Stephanie Bullar LCSW, developed a Treatment Plan.
54. Schoos and Bullar's Treatment Plan noted that Caleb had reported a history of abuse and domestic violence as well as being shot in the head.
55. Schoos and Bullar's Treatment plan identified "problems" associated with Caleb's serious mental illness, including "Psychosis with mood disturbance and self-harming behavior."
56. Schoos and Bullar's Treatment Plan identified that while he was incarcerated, Caleb "required placement on crisis level of care for extended periods of time due to instability and self-harm."
57. Schoos and Bullar's Treatment Plan identified long-term objectives for Caleb, including that he "will be absent of suicidal gestures/endorsements and have a significant reduction of intrusive symptoms by 11/30/21."
58. Schoos and Bullar's Treatment Plan identified short-term objectives for Caleb, including the following:
    a. That he would "identify three stressors have led to decompensation and suicidal ideation or self-injurious behaviors in the past weekly for twelve weeks."
    b. That he would "identify 3 negative consequences of substance abuse weekly for 12 weeks."
    c. That he "will take al psychotropic medication as prescribed daily for 12 weeks."
59. The Treatment Plan indicated that Stephanie Bullar was to report progress on these objectives at 21 days from May 14, 2021.
60. There is no record showing Bullar's self-prescribed follow-up report on these objectives.
61. In the Treatment Plan, Dr. Schoos recorded several narrative observations regarding Caleb, including the following:

    a. Caleb "described the past year as being very stressful due to the great ideas he has had going through his mind envisioning the universe[.]"

    b. He had difficulty sleeping in the past.

    c. He had a "preoccupation with thoughts of Heaven, hell, and heck."

62. In the Treatment Plan, Schoos and Bullar determined that if Caleb was released "he would become a danger to himself and others."

63. Schoos and Bullar's Treatment Plan denoted multiple barriers to Caleb's transfer, including "[p]atient is a danger to self."

64. On May 13, 2021, Stephanie Bullar conducted Caleb's Comprehensive Social Work Assessment and determined the following:

    a. Caleb reported a history of abuse, domestic violence, and being shot in the head;

    b. Caleb required crisis watch on numerous occasions during his IDOC incarceration;

    c. In 2019, Caleb punched himself in the eye;

    d. One of Caleb's juvenile detentions resulted from him using a fingernail file to stab his own chest and heart;

    e. Court-enforced medications were ordered in April 2021;

    f. Caleb reported a history of physical abuse while on the street;

    g. Caleb was "religiously preoccupied and state[d] that his name 'used' to be Caleb Emory;"

    h. Caleb had "thought disturbances" that included "religious delusions" and "loose associations;"

    i. Although he denied current thoughts of suicide or self-harm, he had experienced such thoughts in the past;

    j. Caleb had self-inflicted, superficial scrapes and cuts;

    k. Caleb's treatment plan included seeing a licensed clinical social worker for therapy once a week.

65. Despite noting several factors associated with increased suicide risk, Bullar characterized Caleb as a "low risk" for suicide.

66. Upon information and belief, Defendants evaluated Caleb in a team capacity and were aware of each other's individual assessments and associated documentation.

67. Caleb's DHS Functional Assessment Screening, dated May 13, 2021, indicates that a nurse assessing Caleb requested that Caleb have a chaplain visit him.
68. An Infirmary Admission Note, dated May 13, 2021, noted that Caleb did not have anyone he wished to inform of his transfer to Chester.
69. On May 16, 2021, at Chester Mental Health Center, Mr. Emory was indicated to have "severe and enduring mental health problems."
70. Caleb's DHS Rehabilitation Services and Functional Screening, dated May 18, 2021, indicated the following:
    a. Caleb had "a long history of institutional living and substance abuse."
    b. Caleb had approximately twenty prior arrests.
    c. Caleb had poor insight into his own illness.
71. Caleb denied the need for medication despite his diagnosis of schizoaffective disorder

   **C.  Caleb's preventable, untimely death.**
72. On May 23, 2021, Mr. Emory reported in therapy to a DHS agent that his hand felt like it was on fire and burning and on May 24, 2021, he complained of anxiety.
73. Mr. Emory communicated to relatives that he was being overmedicated and his anxiety was increasing.
74. On May 26, 2021, Caleb told his DHS psychiatrist he was "kind of sad" and "my mind was bothering me."
75. On May 30, 2021, Caleb refused breakfast three times to DHS staff.
76. On June 2, 2021, Caleb completed his application for voluntary admission into Chester, which indicated a desire to continue treatment there.
77. Neither Chester nor DHS has records reflecting Caleb's mental health or psychiatric treatment between June 3 and June 7, 2023.
78. Stephanie Bullar did not report on the progress of Caleb's short-term objectives 21 days after May 14, 2021, despite the treatment plan's directive to do so.
79. Caleb was not seen by a therapist, psychiatrist, or other mental health professional on June 3, 2021.
80. Caleb was not seen by a therapist, psychiatrist, or other mental health professional on June 4, 2021.

81. Caleb was not seen by a therapist, psychiatrist, or other mental health professional on June 5, 2021.
82. Caleb was not seen by a therapist, psychiatrist, or other mental health professional on June 6, 2021.
83. Caleb was not seen by a therapist, psychiatrist, or other mental health professional on June 7, 2021 prior to his death by suicide.
84. Staff at Chester Medical Center, including a person named Jason, indicated to Caleb's family that they were supposed to check on him every 15 minutes.
85. At no time did the medical staff of Chester Mental Health Center complete 15 minute or more frequent checks on Caleb.
86. Caleb occupied a single cell at Chester Mental Health.
87. Caleb had no social visits while at Chester.
88. Despite information regarding his suicidal tendencies, from June 3, 2021 until June 7, 2021, Caleb was held in a cell with multiple instruments with which he could commit suicide including a bedsheet.
89. Despite information regarding his suicidal tendencies, from June 3, 2021 until June 7, 2021, instruments that Caleb could commit suicide with were not removed from his cell.
90. Mr. Emory was set to be released on June 11, 2021.
91. On June 7, 2021, Caleb did not arrive at breakfast.
92. For the three hours prior to breakfast, appropriate checks were not conducted on Caleb.
93. It was only after Caleb did not arrive for breakfast that Chester Mental Health Center staff went to check on Mr. Emory for the first time that day and found him hanging from a bedsheet in the doorway of his cell.
94. Caleb had been dead for approximately three hours before Chester Mental Health Staff went to his cell.
95. Caleb was never revived.
96. The Medical Examiner indicated that the cause of death was asphyxia through the mechanism of the bedsheet and the manner of death was suicide.
97. Caleb died 3 hours before he was found at or around 8:14AM.

## COUNT I: CIVIL RIGHTS VIOLATION UNDER 42 U.S.C. 1983

### EIGHTH AND FOURTEENTH AMENDMENT
### Failure to Provide Medical Attention

**Against Defendants Monique L. Manderson, Stephanie Bullar, Raymelle Schoos, Kelly Koeneman**

22. Each paragraph of this complaint is incorporated as if fully restated here.

23. At all relevant times, Defendants Manderson, Bullar, Schoos, and Koeneman acted under color of law.

24. Caleb had a clearly established constitutional right to be free from cruel and unusual punishment under the Eighth Amendment, which includes the right to adequate medical care and to be protected from self-destructive tendencies.

25. At all relevant times and while in involuntary custody at Chester, Caleb experienced serious mental illness and an elevated risk of suicide.

26. At all relevant times and while in involuntary custody at Chester, Caleb was at serious risk of harm and in need of medical treatment.

27. At all relevant times and while in involuntary custody at Chester, Caleb's mental illness and elevated risk of suicide were serious medical needs and conditions.

28. At all relevant times and while in involuntary custody at Chester, Defendants Manderson, Bullar, Schoos, and Koeneman knew Caleb Emory had a serious medical need and self-destructive tendencies.

29. At all relevant times and while in involuntary custody at Chester, Defendants Manderson, Bullar, Schoos, and Koeneman knew that Caleb had a serious mental illness, was at an elevated risk of suicide, and that he posed an ongoing serious risk of harming himself.

30. At all relevant times and while in involuntary custody at Chester, Defendants Manderson, Bullar, Schoos, and Koeneman acted with deliberate indifference toward Caleb Emory's serious medical needs and self-destructive tendencies.

31. Defendants' failure to provide adequate medical care constituted deliberate indifference to the known and obvious consequences of allowing an incarcerated person, with known mental health issues and elevated suicide risk, to not receive protection from his self-destructive tendencies, in violation of Caleb Emory's constitutional rights.

32. Defendants' failure to provide adequate medical care constituted deliberate indifference to the known and obvious consequences of allowing an incarcerated person, with known mental health issues and elevated suicide risk to go untreated and unmonitored, in violation of Caleb Emory's constitutional rights.

33. Defendants Manderson, Bullar, Schoos, and Koeneman failed to take reasonable measures to ensure that Caleb was adequately monitored, received adequate mental health treatment, and was otherwise properly designated and treated as a serious suicide risk.

34. As a result of Defendants' deliberate indifference to the medical care, mental health treatment, and monitoring of Caleb Emory and Defendants failure to protect William Maxwell from self-destructive tendencies, Caleb Emory died by suicide.

35. Moreover, as a direct and proximate result of Defendants' conduct, Caleb Emory suffered injuries and Plaintiff is entitled to recover all damages allowable for constitutional violations such as 42 USC § 1983, including compensatory damages, special damages, economic damages, all costs incurred in prosecuting this action, and attorney's fees pursuant to 42 USC § 1988.

36. WHEREFORE, Plaintiff DARRELL ALLEN BAILEY, individually and as Independent Administrator of the Estate of Caleb Emory, demands judgment against Defendants Manderson, Bullar, Schoos, and Koeneman for damages, costs, disbursements, attorney's fees, interests, and for any further relief that this Court deems fair and just.

WHEREFORE, Plaintiff DARRELL Allen Berlin, Individually and as Independent Administrator of the Estate of Caleb Ray Emory, deceased, respectfully requests judgment against Defendants Manderson, Bullar, Schoos, and Koeneman, jointly and severally, for the following:

A. An award of compensatory, punitive, and nominal damages;
B. An award of full costs and attorneys' fees arising out of this litigation pursuant to 42 U.S.C. § 1988(b); and
C. Any other further relief this Court may deem just and appropriate.

Respectfully submitted,

/s/ Bhavani Raveendran
One of his attorneys
b.raveendran@rblaw.net

**ATTORNEYS FOR PLAINTIFF:**
Bhavani K. Raveendran
Sam Harton
Javier Rodriguez
ROMANUCCI & BLANDIN, LLC
321 N. Clark Street, Suite 900
Chicago, IL  60654
312-458-1000
312-458-1004 (fax)

Danielle Cain
SPIROS LAW, P.C.
1230 W Court Street,
Kankakee, IL 60901
217-443-4343
dcain@spiroslaw.com

Dated: June 1, 2023