## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| DARRELL ALLEN BERLIN, Individually and as Independent Administrator of the Estate of CALEB RAY EMORY, Deceased, | ) ) ) ) ) | |
| Plaintiff, | ) ) | No: **3:23-cv-01912-MAB** |
| v. | ) ) | |
| TYLER MILLSAP, JANICE GUETHLE, STEPHANIE BULLAR, KELLI KOENEMAN, | ) ) ) ) ) | Jury Trial Demanded |
| Defendants | ) ) ) | |

### SECOND AMENDED COMPLAINT[1]

NOW COMES the Plaintiff, Darrell Allen Berlin, individually and as Independent Administrator of the Estate of Caleb Ray Emory deceased, by and through his attorneys, Romanucci and Blandin, LLC, as his Complaint against Tyler Millsap, Janice Guethle, Stephanie Bullar, and Kelli Koeneman, pleading as follows:

### I.   JURY DEMAND

1. Plaintiff Darrell Allen Berlin, individually and as Independent Administrator of the Estate of Caleb Ray Emory, deceased, hereby demands a trial by jury.

### II.   INTRODUCTION

2. On June 7, 2021, Caleb Emory died by suicide at Chester Mental Health Center, an inpatient, psychiatric hospital controlled and operated by the Illinois Department of Human Services.

---

[1] This Honorable Court granted Plaintiff leave to file a Second Amended Complaint on or before August 7, 2024. See ECF 85.

3. Caleb was diagnosed with schizoaffective disorder, a serious mental illness, had a history of attempting suicide and self-harm, and presented with several other factors indicating an elevated risk of suicide.

4. Prior to being transferred to Chester, Caleb was housed at Dixon Correctional Center, but mental health professionals at Dixon determined that they could not provide an adequate level of care for his serious medical needs, and that Caleb needed to be housed in an inpatient facility like Chester Mental Health Center.

5. Staff at Dixon specifically expressed their concern that Caleb was engaging in conduct that may place him in serious physical serious harm if not treated on an inpatient basis, and that hospitalization was necessary to prevent such harm.

6. Defendants knew that Caleb was an increased risk of suicide and a danger to himself; they even included in his treatment goals that he would not engage in suicidal or self-injurious behavior.

7. Despite their knowledge of his serious medical need, Defendants failed to take reasonable measures to ensure that Caleb was adequately monitored, received adequate mental health treatment, or was otherwise properly designated and treated as a serious suicide risk.

8. Due to the Defendants' deliberate indifference, staff at Chester Mental Health Center found Caleb dead in his cell at or around 8:14 a.m., approximately three hours after Caleb had hung himself in the doorway of his cell with a bedsheet.

## III. JURISDICTION AND VENUE

9. The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a), as Plaintiff's causes of action are brought under the Eighth and Fourteenth Amendments to the United States Constitution pursuant to 42 U.S.C. § 1983.

10. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), as one or more of the Defendants resides in this judicial district and a substantial part of the events or omissions giving rise to the claims asserted in this lawsuit occurred in this judicial district.

## IV. PARTIES

11. At all times relevant hereto, Claimant Darrell Allen Berlin, individually and as Independent Administrator of the Estate of Caleb Ray Emory, deceased, was a citizen of the United States and resident of the city of Tilton, county of Vermillion, State of Illinois.

12. On April 12, 2022, the Circuit Court of Vermillion County, Illinois, Probate Division, appointed Darrell Allen Berlin as Special Administrator for the Estate of Caleb Ray Emory, deceased.

13. At all times relevant hereto, the Department of Human Services (IDHS) was organized and existed by and under the laws of the state of Illinois.

14. At all times relevant hereto, Chester Mental Health Center (Chester) was controlled and operated by DHS.

15. At all times relevant, DHS, its agents, subsidiaries, assigns, and employees had custody and took responsibility to ensure the safety of Caleb Ray Emory.

16. At all times relevant hereto, decedent Caleb Ray Emory (also known as Caleb Berlin and hereinafter referred to as "Caleb") was a citizen of the United States and a resident of the county of Randolph, State of Illinois.

17. At all times relevant hereto, Stephanie Bullar was a licensed clinical social worker at Chester Mental Health Center acting under color of law. She is sued in her individual capacity.

18. At all times relevant hereto, Kelly Koeneman was a registered nurse at Chester Mental Health Center acting under color of law. She is sued in her individual capacity.

19. At all times relevant hereto, Tyler Millsap was a security therapy aide at Chester Mental Health Center acting under color of law. He is sued in his individual capacity.

20. At all times relevant hereto, Janice Guethle was a security therapy aide at Chester Mental Health Center acting under color of law. She is sued in his individual capacity.

21. Upon information and belief, at all times relevant hereto, Defendants were employees of IDHS.

## V.    FACTUAL ALLEGATIONS

24. On June 7, 2021, Caleb Ray Emory died by suicide via asphyxiation while in involuntary custody at Chester Mental Health Center under the control, care, and supervision of the Department of Human Services (IDHS).

25. Caleb suffered from schizophrenia and the aftereffects of a traumatic brain injury.

26. As a teenager, Caleb was diagnosed with Attention Deficit/Hyperactivity Disorder (ADHD).

27. Caleb was incarcerated in multiple locations controlled by Illinois Department of Corrections (IDOC) throughout his adult life.

28. In October 2019, while incarcerated at Centralia Correctional Center, Caleb was placed on crisis watch for self-harm after it was reported that he punched himself in the eye.

29.  Caleb was thereafter transferred from Centralia to Dixon Correctional Center's Special Treatment Unit (Dixon STU).

30.  Caleb was released from IDOC on parole on February 19, 2020.

31.  Caleb returned to Stateville NRC only months later on October 2, 2020 for violating his parole after he allegedly lost his host site, cut off his GPS monitor, and began to act strange in public.

32.  From Stateville NRC, Caleb was transferred to Dixon STU.

### A. Caleb's treatment at Dixon

33.  At Dixon STU, Caleb was placed in a mental health setting and "required placement on crisis level of care for extended periods of time due to being unstable," according to a report authored by Licensed Clinical Psychologist (LCP) Sheila Stone (Dr. Stone).

34.  Prior to his placement of crisis watch, Caleb experienced delusions, which caused behavior such as running around his housing unit talking about spirits, stating he would not lock back up "because of his wings," and "having a spirit awakening and that space is unfolding in front of him."

35.  After being placed on crisis watch, Caleb continued to verbalize delusions by saying things like "we are on an intergalactic plantation," "I've been dead since 2016," and that he was a vampire who had his fangs removed.

36.  While Caleb was on crisis watch, he was informed that his mother had called to tell him that she loved him, to which he responded that she was not his mother.

37.  On April 28, 2021, Dr. Sheila Stone completed an Inpatient Certificate in which she stated that Caleb "required placement in a mental health setting within prison due to the presence of psychiatric symptoms and behaviors, which have impacted his ability to function within his environment."

38.  Attached to that certificate was a written evaluation by Dr. Stone in which she explained her reasons for recommending inpatient treatment, which included the following:

   a.  Caleb's most recent diagnosis was Schizophrenia;

   b.  Caleb had also been previously diagnosed with "Unspecified Other Substance Related Disorder" and "Antisocial Personality Disorder;"

   c.  Caleb had "required placement on crisis level of care for extended periods of time due to being unstable";

4

  d. Caleb was placed on crisis watch in October 2019 because he engaged in self-harm by punching himself in the eye;

  e. Caleb often presented with "odd or bizarre behavior, poor hygiene, disorganized thoughts, and delusions[.]"

  f. Caleb was "religiously preoccupied";

  g. Caleb had been on crisis watch for over thirty days;

  h. "Prior to [Caleb's] placement on crisis watch, it was reported by Security and Mental Health Staff that he was running around the dayroom in his housing unit, talking about spirits and stated that he would not lock back up because of his wings.";

  i. Caleb had talked about "having a spirit awakening and that space is unfolding in front of him"

  j. Caleb was unable to state the year;

  k. Caleb was prescribed Zyprexa, was refusing psychotropic medication, and had been placed on enforced medication status on April 6, 2021;

  l. Caleb was adamant that his name was Gabriel, not Emory;

  m. Caleb verbalized delusions;

  n. Caleb was disoriented, hostile, and agitated;

  o. Caleb had been in special education classes in school and got sent to "behavior school;"

  p. Caleb had a history of abuse and domestic violence;

  q. Caleb had previously been shot in the head;

  r. Caleb had a significant history of substance abuse;

  s. Caleb's family member stated that people are scared of Caleb when he doesn't take his medication and he had previously been aggressive with her and her daughter

39. On or about April 28, 2021, at Dixon Correctional Center, Dr. Stone noted her concern that Caleb was engaging in conduct that may place him in serious physical serious harm if not treated on an inpatient basis, and that hospitalization was necessary to prevent such harm.

40. On or about April 28, 2021, at Dixon Correctional Center, Dr. Stone noted her concern that "he is at risk for further deterioration of his mental health and at risk for hurting himself or others."

41. At the time of her inpatient recommendation on April 28, 2021, Caleb had been on crisis watch for over 30 days.

42. On May 1, 2021, Roman Marquez, MD, completed a second Intake Certificate, in which he indicated that Caleb was at risk of harming himself unless placed on an inpatient basis and needed immediate hospitalization for the prevention of such harm.

**B. Caleb's arrival at Chester Mental Health Center.**

43. On May 13, 2021, Caleb was transferred to an inpatient treatment facility, Chester Mental Health Center (Chester), which was under the custody and control of DHS.

44. Caleb was housed at CMHC on Unit B, Module 2, Room #510, which is a maximum-security unit.

45. During "midnight" shift, patients in Unit B, Module 2 are locked in their bedroom and cannot open their doors from the inside.

46. "Midnight" shift is from 11 p.m. to 7 a.m.

47. At all times relevant hereto, Monique L. Manderson was a psychiatrist at Chester.

48. At all times relevant hereto, Stephanie Bullar was a licensed clinical social worker at Chester.

49. At all times relevant hereto, Raymelle Schoos was a psychiatrist at Chester.

50. At all times relevant hereto, Kelly Koeneman was a registered nurse at Chester.

51. At all times relevant hereto, Francine Poindexter was a registered nurse at Chester.

52. At all times relevant hereto, Tyler Millsap and Janice Guethle were Security Therapy Aides (STAs) at Chester.

53. Defendant Millsap was hired by IDHS to work at Chester on October 1, 2001, and was promoted to STA 1 on April 1, 2002.

54. Prior to Caleb's death, Millsap had been disciplined by IDHS and Chester multiple times for "time-related issues."

55. Less than six months before Caleb's death, on Janiceuary 18, 2021, STA Millsap received a 5-day suspension for conduct unbecoming of a state employee that was related to neglect of a patient.

56. Defendant Guethle was hired by IDHS to work at Chester on April 16, 2019 as a trainee, and was promoted t STA 1 on October 16, 2019.

57. Defendant Geuthe had been disciplined for unauthorized absence prior to Caleb's death.

58. At all times relevant hereto, Millsap, Guethle, Manderson, Bullar, Schoos, and Koeneman were agents, employees, and/or servants of the Department of Human Services (DHS).

59. While at Chester Mental Health Center, Caleb was at an elevated risk of suicide.

60.  An elevated risk of suicide is a serious medical condition.[2]

61.  The following factors, among others, are associated with an increased risk of suicide in incarcerated individuals:[3]

    a.  history of attempted suicide;

    b.  having a history of self-harm;

    c.  being prescribed psychotropic medication;

    d.  current psychiatric diagnosis;

    e.  alcohol misuse;

    f.  white race or ethnicity;

    g.  male gender;

    h.  being convicted of a violent criminal offense;

    i.  occupation of a single cell;

    j.  having no social visits.

62.  Defendants knew through Dixon records, firsthand observations, and the obvious signs that Caleb presented with the above factors and was at an elevated risk of suicide.

63.  Defendants had knowledge of Caleb's serious mental illness, incarceration history, refusal to take medication, symptoms relating to his mental illness, mental instability, and behaviors on and off crisis watch through its agents' review of records and first hand evaluation.

64.  Defendants at Chester obtained and reviewed Dr. Stone's evaluation and the Inpatient Certificates.

65.  Defendants at Chester had knowledge of Dr. Stone's concern that "he is at risk for further deterioration of his mental health and at risk for hurting himself or others."

66.  Defendants at Chester knew that Caleb had been on crisis watch for extended periods of time and was entering Chester having been on crisis for more than 30 days.

67.  Defendants at Chester knew he had been on court-enforced medication since April 6, 2021.

68.  Defendants at Chester knew he was an alcoholic and had a history of using marijuana, cocaine, methamphetamine, heroine, and sleeping pills.

---

[2] *Est. of Clark v. Walker*, 865 F.3d 544, 551 (7th Cir. 2017)
[3] Zhong, Shaoling et al. "Risk factors for suicide in prisons: a systematic review and meta-analysis." *The Lancet. Public health* vol. 6,3 (2021).

69. STA staff at Chester are required to visually observe and account for each patient at least every 15 minutes and look for visible signs to ensure stable condition per Procedure EC .04.01.01.01 – ROUTINE OBSERVATION – PATIENT VISUAL OBSERVATION CHECKS.

70. Nurses at Chester are required to complete rounding on the module specifically focusing on attention to patients by assessing and managing fundamental patient care needs every two hours between the hours of 7 a.m. and 5 a.m.

71. Any staff member observing overt or covert signs of individual suicidal, self-injurious, or self-destructive behavior is responsible for immediately notifying the Unit Director, Clinical Nurse Manager, Unit RN and STA II per Procedure .06.00.00.02(II)(A).

72. Any staff member observing overt or covert signs of individual suicidal, self-injurious, or self-destructive behavior is responsible for creating an order for special observation, in which the individual is placed in a room with suicide blankets and no personal property articles, per Procedure.06.00.00.02(II)(A-B).

73. An individual exhibiting overt or cover signs of suicidal, self-injurious, or self-destructive behavior must be seen, as soon as possible by their psychiatrist or another psychiatrist/MOD in the building, along with their therapist, if available, who should be contacted by the unit nurse to assess the individual. The psychiatrist/MOD will write an order for appropriate level of observation based on his/her evaluation of the individual. Procedure .06.00.00.02(II)(B)(3).

74. An individual exhibiting overt or cover signs of suicidal, self-injurious, or self-destructive behavior must receive contact on *at least* a daily basis from their therapist or another coordinating therapist per Procedure .06.00.00.02(II)(B)(5).

75. The individual's psychiatrist, or if unavailable, another psychiatrist on duty may order discontinuation of special observation for a suicide attempt/threat, self-injurious, or self-destructive behavior per Procedure .06.00.00.02(II)(D).

76. Upon admission to Chester, all patients should be assessed for suicide risk to determine the need for safety measures (Special Observations; one to one, frequent and/or other). Assessment is completed with the IL462-0042 Initial Psychiatric Evaluation and the completion of the Admission Suicide Assessment (CMHC-745) per PE .01.01.01.17.

77. Per PE .01.01.01.17, all patients should receive an Initial Psychiatric Nursing Assessment IL462-0042 and the CMHC-750 Columbia Suicide Risk Screening Form addressing risk for suicide and self-harm behavior within eight (8) hours of admission to Chester. The registered nurse shall assess the individual for potential need of special observation as a nursing measure

and will assign staff accordingly until a physician's order may be obtained, and subsequently
write a progress note.

78. The Nurse shall assess all patients for risk of suicide and self-harm behavior for 30 consecutive
days from the date of admission between the hours of 7am-9am by completing the Daily
Suicide Severity Rating Scale (CMHC-755), after which time, the registered nurse shall assess
the individual for potential need of special observation and will assign staff accordingly until a
physician's order may be obtained. per PE .01.01.01.17.

79. The Daily Suicide Severity Rating Scales will be reviewed by the multidisciplinary treatment
team each morning to ensure any identified suicide risk is addressed, after which Modification
to the individual's treatment plan should be completed as necessary, and Form CMHC-755
should be filed in patient's clinical record upon completion, per PE .01.01.01.17.

80. Chester Mental Health Center maintains a policy of providing "a safe and therapeutic
environment which includes providing a level of observation for each individual that is
appropriate to the individual's clinical needs."

81. PE .01.01.01.17 requires that patients identified as a moderate risk for suicide and self-harm
receive immediate interventions implemented and according to the treatment plan schedule.

82. PE .01.01.01.17 requires that interventions and follow-up documentation regarding progress
must also be included in the Treatment Plan review after a patient has been identified as a
moderate suicide risk.

83. PE .01.01.01.17 requires patients identified as high risk for suicide and self-harm will have
immediate safety measures implemented.

84. On May 13, 2023, Monique Manderson conducted Caleb's Initial Psychiatric Evaluation, and
indicated that she had obtained and reviewed the Inpatient Certificates and Dr. Stone's
evaluation.

85. Manderson thus had knowledge of the information in those documents, including the
recommendation that Caleb be placed in a "structured setting that will monitor him closely for
his own safety."

86. Caleb's Initial Psychiatric Evaluation reviewed by Manderson also noted the following:

   a. Dixon staff had "essential reservations about Caleb's ability to return to the community;"

   b. Caleb's "chief complaint" was "I go by Galeb;"

   c. Caleb's family had expressed significant concerns about his ability to return to society as
   well and was seeking guardianship over her son;

    d.  People were "scared" of Caleb when he did not take his medication;

    e.  Caleb had poor hygiene, poor self-care, and an overall disheveled appearance;

    f.  Caleb had a history of fighting with staff and officers;

    g.  Caleb had a history of hearing voices;

    h.  Caleb reported polysubstance abuse of marijuana, cocaine, crack, methamphetamine, and alcohol;

    i.  Caleb's mother was diagnosed with Bipolar Disorder;

    j.  Caleb's attitude was guarded, paranoid, and suspicious;

    k.  Caleb's thought content contained "delusions of grandeur, in addition to hyperreligiousity;"

    l.  Caleb was noncompliant with his psychotropic medication.

87.  Manderson noted in this Evaluation that, at Dixon, Caleb "was deemed dangerous to self and others."

88.  On May 13, 2023, Monique Manderson conducted Caleb's 3-day Treatment Plan Worksheet, in which she indicated the following:

    a.  Caleb's primary diagnosis was schizoaffective disorder.

    b.  Caleb's secondary diagnosis was polysubstance abuse of cocaine, meth, and marijuana.

    c.  Caleb had disorganized thoughts, history of verbal and physical aggression, paranoia, and impaired insight and judgment.

    d.  Caleb was prescribed Olanzapine for his psychosis and mood.

    e.  Caleb was prescribed Lorazepam for his anxiety and agitation.

89.  Despite noting several factors associated with increased risk of suicide and noting that there were no protective factors for suicide, Manderson disregarded the information and indicated there were not serious suicidal concerns.

90.  Manderson disregarded the information available to her and recommended Caleb be subject to the lowest level of observation frequency.

91.  On May 13, 2021, Manderson completed Caleb's Admission Suicide Risk Assessment, noting the following:

    a.  Caleb's primary diagnosis was schizoaffective disorder.

    b.  Caleb's secondary diagnosis was polysubstance abuse of cocaine, meth, alcohol, and marijuana.

    c.  Caleb tried to hang himself five years ago.

     d.   Caleb did not make any future plans during his assessment.

92.   Despite noting several factors associated with increased risk of suicide, noting that there were
no protective factors for suicide, and knowing that Dixon mental health professionals deemed
Caleb dangerous to himself, Manderson disregarded all of this knowledge and indicated that
there were not serious suicidal concerns.

93.   Despite all her knowledge of mental health and suicide risk, Manderson recommended Caleb
be subject to the lowest level of observation frequency.

94.   On May 13, 2021, Koeneman completed an Initial Suicide Assessment Form, noting that
Caleb had wished he was dead, wished he could go to sleep and not wake up, and had actual
thoughts of killing himself.

95.   This Initial Suicide Assessment Form characterized Caleb as having a high risk of suicide.

96.   On May 13, 2021, Koeneman completed Caleb's Initial Psychiatric Nursing Assessment,
noting the following:

     a.   Caleb responded "I burnt my grandma's house down" when asked what problems
brought him to the hospital;

     b.   Caleb was having religious delusions;

     c.   Caleb had attempted suicide at least twice in the past, with the most recent attempt being
2015;

     d.   Caleb had a history of engaging in "fire setting behavior;"

     e.   Caleb had previously had surgery on his face, nose, lip, and earlobe;

     f.   Caleb's recent memory was impaired;

     g.   Caleb had an irregular pulse;

     h.   The facility had "Knowledge of Medication" and a "Plan to Manage Psychiatric Illness"
that was further detailed in his treatment plan.

97.   On May 13, 2021, Koeneman and Manderson created Caleb's Admission Treatment Plan,
which noted that Caleb had psychiatric problems including psychosis, mood disorder,
aggression, and a history of inappropriate sexual behaviors.

98.   Their Admission Treatment Plan failed to identify suicide and self-injury as one of Caleb's
psychiatric problems yet included "Patient will have no suicidal ideation or self-injurious
behaviors for 30 days" as one of his long-term treatment goals.

99.   Their Admission Treatment Plan noted his "Emotional Dysregulation" as "anxious" and
"labile."

100. Their Admission Treatment Plan noted Caleb suffered from delusions.

101. Between May 14 and May 21, 2021, the medical team at Chester, including treating psychiatrist Dr. Raymelle Schoos and Therapist Stephanie Bullar LCSW, developed a Treatment Plan.

102. Schoos and Bullar's Treatment Plan noted that Caleb had reported a history of abuse and domestic violence as well as being shot in the head.

103. Schoos and Bullar's Treatment plan identified "problems" associated with Caleb's serious mental illness, including "Psychosis with mood disturbance and self-harming behavior."

104. Schoos and Bullar's Treatment Plan identified that while he was incarcerated, Caleb "required placement on crisis level of care for extended periods of time due to instability and self-harm."

105. Schoos and Bullar's Treatment Plan identified long-term objectives for Caleb, including that he "will be absent of suicidal gestures/endorsements and have a significant reduction of intrusive symptoms by 11/30/21."

106. Schoos and Bullar's Treatment Plan identified short-term objectives for Caleb, including the following:

    a. That he would "identify three stressors have led to decompensation and suicidal ideation or self-injurious behaviors in the past weekly for twelve weeks."

    b. That he would "identify 3 negative consequences of substance abuse weekly for 12 weeks."

    c. That he "will take al psychotropic medication as prescribed daily for 12 weeks."

107. The Treatment Plan indicated that Stephanie Bullar was to report progress on these objectives at 21 days from May 14, 2021.

108. There is no record showing Bullar's self-prescribed follow-up report on these objectives.

109. In the Treatment Plan, Dr. Schoos recorded several narrative observations regarding Caleb, including the following:

    a. Caleb "described the past year as being very stressful due to the great ideas he has had going through his mind envisioning the universe[.]"

    b. He had difficulty sleeping in the past.

    c. He had a "preoccupation with thoughts of Heaven, hell, and heck."

110. In the Treatment Plan, Schoos and Bullar determined that if Caleb was released "he would become a danger to himself and others."

111. Schoos and Bullar's Treatment Plan denoted multiple barriers to Caleb's transfer, including "[p]atient is a danger to self."

12

112. On May 13, 2021, Stephanie Bullar conducted Caleb's Comprehensive Social Work Assessment and determined the following:

    a. Caleb reported a history of abuse, domestic violence, and being shot in the head;

    b. Caleb required crisis watch on numerous occasions during his IDOC incarceration;

    c. In 2019, Caleb punched himself in the eye;

    d. One of Caleb's juvenile detentions resulted from him using a fingernail file to stab his own chest and heart;

    e. Court-enforced medications were ordered in April 2021;

    f. Caleb reported a history of physical abuse while on the street;

    g. Caleb was "religiously preoccupied and state[d] that his name 'used' to be Caleb Emory;"

    h. Caleb had "thought disturbances" that included "religious delusions" and "loose associations;"

    i. Although he denied current thoughts of suicide or self-harm, he had experienced such thoughts in the past;

    j. Caleb had self-inflicted, superficial scrapes and cuts;

    k. Caleb's treatment plan included seeing a licensed clinical social worker for therapy once a week.

113. Despite noting several factors associated with increased suicide risk, Bullar characterized Caleb as a "low risk" for suicide.

114. Upon information and belief, Defendants evaluated Caleb in a team capacity and were aware of each other's individual assessments and associated documentation.

115. Caleb's DHS Functional Assessment Screening, dated May 13, 2021, indicates that a nurse assessing Caleb requested that Caleb have a chaplain visit him.

116. An Infirmary Admission Note, dated May 13, 2021, noted that Caleb did not have anyone he wished to inform of his transfer to Chester.

117. On May 16, 2021, at Chester Mental Health Center, Caleb was indicated to have "severe and enduring mental health problems."

118. Caleb's DHS Rehabilitation Services and Functional Screening, dated May 18, 2021, indicated the following:

    a. Caleb had "a long history of institutional living and substance abuse."

    b. Caleb had approximately twenty prior arrests.

    c. Caleb had poor insight into his own illness.

119. Caleb denied the need for medication despite his diagnosis of schizoaffective disorder.

120. No Defendant, including Nurse Koeneman, ever completed the Daily Suicide Severity Rating Scales required for the first thirty days of admission per PE .01.01.01.17.

### C. Caleb's preventable, untimely death.

121. On May 23, 2021, Caleb reported in therapy to a DHS agent that his hand felt like it was on fire and burning and on May 24, 2021, he complained of anxiety.

122. Caleb communicated to relatives that he was being overmedicated and his anxiety was increasing.

123. On May 26, 2021, Caleb told his DHS psychiatrist he was "kind of sad" and "my mind was bothering me."

124. On May 30, 2021, Caleb refused breakfast three times to DHS staff.

125. On June 2, 2021, Caleb completed his application for voluntary admission into Chester, which indicated a desire to continue treatment there.

126. Neither Chester nor DHS has records reflecting Caleb's mental health or psychiatric treatment between June 3 and June 7, 2023.

127. Stephanie Bullar did not report on the progress of Caleb's short-term objectives 21 days after May 14, 2021, despite the treatment plan's directive to do so.

128. Caleb was not seen by a therapist, psychiatrist, or other mental health professional on June 3, 2021.

129. Caleb was not seen by a therapist, psychiatrist, or other mental health professional on June 4, 2021.

130. Caleb was not seen by a therapist, psychiatrist, or other mental health professional on June 5, 2021 besides a "brief check in" with Bullar

131. Caleb was not seen by a therapist, psychiatrist, or other mental health professional on June 6, 2021.

132. Caleb was not seen by a therapist, psychiatrist, or other mental health professional on June 7, 2021 prior to his death by suicide.

133.  Guethle and Millsap were assigned to a shift on Unit B, Module 2 on June 6, 2021, at 11 p.m. to June 7, 2021, at 7 a.m.

134. Guethle and Millsap were aware that they were required to do "rounds" every fifteen minutes.

135. On June 6 and 7, 2021, Guethle and Millsap were aware that they were required to visually observe and account for each patient in Unit B, Module 2 at least every fifteen minutes during rounds.

136. Guethle and Millsap were aware that Caleb Emory had serious medical needs related to his mental illness.

137. Guethle and Millsap were aware that Caleb Emory had serious medical needs, including a risk of suicide.

138. Guethle and Millsap were aware that Caleb Emory was at a substantial risk of harm if not appropriately monitored and supervised.

139. Millsap did not complete a round for his entire shift.

140. Guethle only completed four rounds during her entire shift.

141. Guethle completed her first round at 12:00 a.m.

142. Guethle completed her second round at 12:39 a.m.

143. Guethle and Millsap took their lunch breaks from 2 a.m. to 3 a.m., during which time STAs Morgan Buatte and Alex Liggett covered their duties.

144. Buatte and Liggett did not do any rounds while covering for Guethle and Millsap.

145. Guethle completed her third round at 3:12 a.m.

146. The last round Guethle completed while on her shift was at 3:43 a.m.

147. No rounds were completed on June 7, 2021 in Chester Unit B, Module 2 from 3:44 a.m. to 6:55 a.m.

148. No one visually observed or accounted for Caleb between 3:44 a.m. and 6:55 a.m.

149. The morning shift for Unit B, Module 2 started at 7 a.m.

150. The staff assigned to Unit B, Module 2's morning shift included STAs S'Vonte Donaby, Joey Fricke, and Baylee Modglin.

151. S'Vonte Donaby completed a round at 6:56 a.m., at which time she observed Caleb in his room with his back to the door and facing the window.

152. Joey Fricke completed a round at 7:01 a.m., at which time he observed Caleb in his room with his back to the door and facing the window.

153. Baylee Modglin completed a round at 7:03 a.m., at which time she observed Caleb in his room with his back to the door and facing the window.

154. No rounds were completed on June 7, 2021 in Chester Unit B, Module 2 from 3:44 a.m. to 6:56 a.m.

155.  No one visually observed or accounted for Caleb between 7:04 a.m. and 7:38 a.m.

156.  S'Vonte Donaby completed a round at 7:39 a.m., at which time she observed Caleb in his room with his back to the door and facing the window.

157.  S'Vonte Donaby completed a round at 7:55 a.m., at which time she observed Caleb in his room with his back to the door and facing the window.

158.  Joey Fricke completed a round at 8:03 a.m., at which time he observed Caleb in his room with his back to the door and facing the window.

159.  Joey Fricke looked into Caleb's room and knocked at 8:06 a.m., at which time he observed Caleb with his back to the door and facing the window, then returned to the nurses who were preparing to pass out morning medications.

160.  Donaby, Fricke, and Modglin believed Caleb to be looking out the window across the room when they observed him.

161.  Millsap falsified his round sheets to reflect that he had done rounds at 11:00 p.m., 11:15 p.m., 11:30 p.m., 11:45 p.m., 1:00 a.m., 1:15 a.m., 1:30 a.m., 1:45 a.m., 2:00 a.m., 2:15 a.m., 2:30 a.m., 2:45 a.m., 3:00 a.m., 3:15 a.m., 3:30 a.m., 6:00 a.m., 6:15 a.m., 6:30 a.m., 6:45 a.m.

162.  Guethle falsified her round sheets to reflect that she had done rounds at 12:00 a.m., 12:15 a.m., 12:30 a.m., 12:45 a.m., 3:45 a.m., 4:00 a.m., 4:15 a.m., 4:30 a.m., 4:45 a.m., 5:00 a.m., 5:15 a.m., 5:30 a.m., 5:45 a.m.

163.  Guethle and Millsap were responsible for all rounds from 11 p.m. on June 6, 2021, to 7 a.m. on June 7, 2021.

164.  Guethle saw Millsap get up at times but was unsure if he was completing his rounds when he got up.

165.  Guethle observed that Millsap seemed to have completed his round sooner than he should have and it did not seem like he was taking enough time to adequately complete them.

166.  Donaby falsified the round sheet to reflect that she had completed a round at 7:15 a.m.

167.  Nurse Francine Poindexter worked from 7 p.m. on June 6, 2021, to 7 a.m. on April 7, 2021.

168.  Poindexter was required to physically make rounds every two hours between the hours of 7 a.m. and 5 a.m. to assess and manage fundamental patient care needs.

169.  Poindexter never completed a round during her shift.

170.  Poindexter falsified the round sheets to indicated that she had assessed and managed fundamental patient care needs on June 6, 2021, and June 7, 2021.

16

171. Poindexter has stated that she was never made aware of her responsibility to complete rounds every two hours.

172. Poindexter has stated that she witnessed other nurses "check of rounding sheets" during her training, rather than completing the required rounds.

173. At 8:08 a.m., Modglin approached Emory's door to conduct a round and observed Caleb facing towards his room's window.

174. At 8:08 a.m., Modglin knocked on Emory's door and tried to push it open.

175. After Modglin was unable to initially open the door, Fricke joined her in attempting to push the door open.

176. As Modglin and Fricke tried to push the door open, Modglin looked upward and saw something wrapped underneath the door magnet.

177. After observing something wrapped underneath the door magnet, Modglin told Fricke she believed Caleb was hanging.

178. Modglin went for assistance as Fricke called a Code Blue and continued to try to push the door open.

179. Donaby ran to Caleb's cell and helped Fricke push inside.

180. At 8:10 a.m., Caleb was carried out of the room, laid onto the floor, and received CPR.

181. Caleb was pronounced dead at 8:14 a.m.

182. Caleb occupied a single cell at Chester Mental Health.

183. Caleb had no social visits while at Chester.

184. Despite information regarding his suicidal tendencies, from June 3, 2021, until June 7, 2021, Caleb was held in a cell with multiple instruments with which he could commit suicide including a bedsheet.

185. Despite information regarding his suicidal tendencies, from June 3, 2021, until June 7, 2021, instruments that Caleb could commit suicide with were not removed from his cell.

186. Caleb was set to be released on June 11, 2021.

187. The Medical Examiner indicated that the cause of death was asphyxia through the mechanism of the bedsheet and the manner of death was suicide.

## COUNT I: CIVIL RIGHTS VIOLATION UNDER 42 U.S.C. 1983

## EIGHTH AND FOURTEENTH AMENDMENT

### Against Defendants Stephanie Bullar and Kelly Koeneman

188.    Paragraphs 1 through 187 are incorporated as if fully restated here.

189.    At all relevant times, Defendants Bullar and Koeneman acted under color of law.

190.    Caleb had a clearly established constitutional right to be free from cruel and unusual punishment under the Eighth Amendment, which includes the right to adequate medical care and to be protected from self-destructive tendencies.

191.    At all relevant times and while in involuntary custody at Chester, Caleb experienced serious mental illness and an elevated risk of suicide.

192.    At all relevant times and while in involuntary custody at Chester, Caleb was at serious risk of harm and in need of medical treatment.

193.    At all relevant times and while in involuntary custody at Chester, Caleb's mental illness and elevated risk of suicide were serious medical needs and conditions.

194.    At all relevant times and while in involuntary custody at Chester, Defendants Bullar and Koeneman knew Caleb Emory had a serious medical need and self-destructive tendencies.

195.    At all relevant times and while in involuntary custody at Chester, Defendants Bullar and Koeneman knew that Caleb had a serious mental illness, was at an elevated risk of suicide, and that he posed an ongoing serious risk of harming himself.

196.    At all relevant times and while in involuntary custody at Chester, Defendants Bullar and Koeneman acted with deliberate indifference toward Caleb Emory's serious medical needs and self-destructive tendencies.

197.    Defendants' failure to provide adequate medical care constituted deliberate indifference to the known and obvious consequences of allowing an incarcerated person, with known mental health issues and elevated suicide risk, to not receive protection from his self-destructive tendencies, in violation of Caleb Emory's constitutional rights.

198.    Defendants' failure to provide adequate medical care constituted deliberate indifference to the known and obvious consequences of allowing an incarcerated person, with known mental health issues and elevated suicide risk to go untreated and unmonitored, in violation of Caleb Emory's constitutional rights.

199.    Defendants Bullar and Koeneman failed to take reasonable measures to ensure that Caleb was adequately monitored, received adequate mental health treatment, and was otherwise properly designated and treated as a serious suicide risk.

200.    As a result of Defendants' deliberate indifference to the medical care, mental health treatment, and monitoring of Caleb Emory and Defendants failure to protect Caleb Emory from self-destructive tendencies, Caleb Emory died by suicide.

201.    Moreover, as a direct and proximate result of Defendants' conduct, Caleb Emory suffered injuries and Plaintiff is entitled to recover all damages allowable for constitutional violations such as 42 USC § 1983, including compensatory damages, special damages, economic damages, all costs incurred in prosecuting this action, and attorney's fees pursuant to 42 USC § 1988.

202.    WHEREFORE, Plaintiff Darrell Allen Berlin, individually and as Independent Administrator of the Estate of Caleb Emory, demands judgment against Defendants Manderson, Bullar, Schoos, and Koeneman for damages, costs, disbursements, attorney's fees, interests, and for any further relief that this Court deems fair and just.

## COUNT II: CIVIL RIGHTS VIOLATION UNDER 42 U.S.C. 1983
### EIGHTH AND FOURTEENTH AMENDMENT
**Against Defendants Tyler Millsap and Janice Guethle**

203.    Paragraphs 1 through 187 are incorporated as if fully restated here.

204.    At all relevant times, Defendants Millsap and Guethle acted under color of law.

205.    Caleb had a clearly established constitutional right to be free from cruel and unusual punishment under the Eighth Amendment, including the right to not be subjected to conditions of confinement that placed him at a substantial risk of harm.

206.    Caleb had a clearly established constitutional right to be free from cruel and unusual punishment under the Eighth Amendment, which includes the right to adequate medical care and to be protected from self-destructive tendencies.

207.    As an individual in a mental health treatment facility, Caleb had serious medical need that was so obvious that even someone who is not a doctor, including Defendants, would recognize that it requires treatment.

208.    Defendants were aware of Caleb's serious medical need.

209.    Defendants failed to take reasonable measures to keep Caleb safe in light of his serious medical needs.

19

210.    Defendants' failure to provide visual checks on Caleb from 3:48 a.m. to 6:57 a.m. subjected
Caleb to a strong likelihood of serious harm.

211.    Defendants were aware that their failure to provide visual checks on Caleb from 3:48 a.m. to
6:57 a.m. subjected Caleb to a strong likelihood of serious harm.

212.    Defendants consciously failed to take reasonable measures to prevent harm from occurring.

213.    Defendants were deliberately indifferent to Caleb's serious medical need.

214.    As a result of Defendants' deliberate indifference to the medical care, mental health
treatment, safety, and monitoring of Caleb Emory, Caleb Emory died by suicide.

215.    Moreover, as a direct and proximate result of Defendants' conduct, Caleb Emory suffered
injuries and Plaintiff is entitled to recover all damages allowable for constitutional violations
such as 42 USC § 1983, including compensatory damages, special damages, economic damages,
all costs incurred in prosecuting this action, and attorney's fees pursuant to 42 USC § 1988.

216.    WHEREFORE, Plaintiff Darrell Allen Berlin, individually and as Independent
Administrator of the Estate of Caleb Emory, demands judgment against Defendants Millsap and
Guethle for damages, costs, disbursements, attorney's fees, interests, and for any further relief
that this Court deems fair and just.


WHEREFORE, Plaintiff Darrell Allen Berlin, Individually and as Independent Administrator of
the Estate of Caleb Ray Emory, deceased, respectfully requests judgment against Defendants Bullar,
Koeneman, Millsap, and Guethle jointly and severally, for the following:

A.  An award of compensatory, punitive, and nominal damages;

B.   An award of full costs and attorneys' fees arising out of this litigation pursuant to 42 U.S.C.
§ 1988(b); and

C.  Any other further relief this Court may deem just and appropriate.


Dated: July 26, 2024,                              Respectfully submitted,


                                                   /s/ Sam Harton
                                                   One of his attorneys
                                                   sharton@blaw.net


20

**ATTORNEYS FOR PLAINTIFF:**

Bhavani K. Raveendran
Sam Harton
ROMANUCCI & BLANDIN, LLC
321 N. Clark Street, Suite 900
Chicago, IL  60654
312-458-1000
312-458-1004 (fax)

Danielle Cain
SPIROS LAW, P.C.
1230 W Court Street,
Kankakee, IL 60901
217-443-4343
dcain@spiroslaw.com